UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF FLORIDA

CASE NO. 12-22201-CIV-COHN/SELTZER

CARLOS CUTINO,

    Plaintiff,

v.

JOHN UNTCH, STEPHEN JEPKEMA,
MARK MORETTI, individually; SEVERAL
UNKNOWN POLICE OFFICERS OF
THE CITY OF MIRAMAR, FLORIDA,
a Florida municipal corporation; and
THE CITY OF MIRAMAR, FLORIDA,
a Florida municipal corporation,

    Defendants.
_____/

## ORDER GRANTING DEFENDANTS' MOTION FOR SUMMARY JUDGMENT

**THIS CAUSE** is before the Court upon Defendants' Motion for Summary Judgment [DE 122] ("Motion").  The Court has carefully reviewed the Motion and all related filings and is otherwise fully advised in the premises.

**I.    Background**

    **A.    Material Facts**

On June 16, 2008, two detectives of the Miramar, Florida, Police Department applied for a warrant to search a residence in Miramar.  The warrant application provided facts indicating that Anthony Coombes—who had previously been arrested for many crimes, including drug offenses—was selling crack cocaine from the residence.  The application further stated that, in September 2007, a shooting homicide had occurred in the front yard of the home.  Based on this information, a Broward County Circuit Judge issued a warrant to search the house for cocaine and related items.

See DE 123 (Def.'s Statement of Undisputed Facts in Supp. of Mot. for Summ. J.) at 1-2, ¶¶ 1-7; DE 139 (Pl.'s Statement of Disputed Material Facts in Opp'n to Mot. for Summ. J. of Defs.) at 1-2, ¶¶ 1-7.

Soon thereafter, the same detectives issued an Operations Plan ("Plan") for executing the search warrant. In addition to the facts stated in the warrant application, the Plan reported that a confidential informant had seen visitors of the home carrying handguns in their waistbands. Under the Plan, the Miramar SWAT Team would enter the residence, secure it, and allow other law-enforcement officers to search the house. Members of the SWAT Team, including Defendants Detective John Untch and Officer Mark Moretti (together, the "Officers"), were given a tactical briefing on the Plan. See DE 123 at 2-4, ¶¶ 8-11, 14-17; DE 139 at 2-3, ¶¶ 8-11, 14-17.

On June 20, 2008, the SWAT Team entered the house to execute the warrant. The Officers proceeded to a bedroom, where they found Plaintiff Carlos Cutino. See DE 123 at 4, ¶¶ 19, 21; DE 139 at 3, ¶¶ 19, 21. The parties offer differing versions of the events that happened next.

Defendants maintain that when the Officers entered the bedroom where Cutino was located, they had their guns drawn with attached lights. Cutino was lying on his back in bed; his eyes were open, and he was staring blankly. The Officers identified themselves as police and told Cutino to show them his hands. But Cutino rolled over onto his stomach and put his hands in the waistband of his pants, causing the Officers to fear that he might have a weapon. The Officers then pulled Cutino off the bed and onto the floor, causing injuries to his face. When Moretti grabbed Cutino's arm to pull him off the bed, he resisted by bracing, tensing, and locking his arms in place. This behavior continued on the floor, and Cutino refused to remove his hands from his

2

waistband. The Officers tried to secure Cutino's arms behind his back in order to handcuff him, but he was kicking his legs at Moretti. Although the Officers repeatedly told Cutino to stop resisting, he tried to bite Untch and was growling. Also, Untch kneeled on the ground and held Cutino's head between Untch's knees because Cutino was trying to bite him. Moretti struck Cutino's right shoulder with the palm of his hand so that Cutino would release his arm and could be handcuffed. Untch likewise applied palm-heel strikes to Cutino's shoulder blades to get ahold of his arms. The Officers called for support because they needed help to secure Cutino. After a further struggle, and with the assistance of another detective, Cutino was handcuffed and taken to the living room. See DE 123 at 5-7, ¶¶ 23-49.

Cutino testified that when the SWAT Team executed the search warrant, he was sleeping at the residence, the home of Anthony Coombes's mother. Cutino was staying at the house because Coombes's mother had hired him to perform a plumbing job. Coombes and his girlfriend were also present in the home. According to Cutino, he woke up when the bedroom door opened and flashlights were shined in his face. Cutino thought it was Coombes playing a joke on him, so he turned onto his stomach, with his hands by his sides, and went back to sleep. Without saying anything, someone (a police officer, he later learned) pulled him out of bed by his ankles. While Cutino was on the edge of the bed, another officer put him in a chokehold and punched him in the face and on the head. With one hand still on Cutino's throat, the officer lifted Cutino up against the wall. The officer may have said something when he had Cutino in a chokehold, but Cutino could not hear him because he was struggling to breathe and his ears had been beaten. The officer then dropped Cutino onto the granite floor, and his head struck the surface very hard. Officers then pulled Cutino's arms behind his back

and put their knees on his shoulder, with one officer holding his feet. While trying to put Cutino's arms behind his back, officers kicked and stomped him all over his body and hit him with their fists. See DE 121-1 (Dep. of Carlos Cutino) at 11-14, 19-21, 24-39, 41-42, 105-08, 111-14, 116-18, 127.

Thereafter, Cutino testified, two officers dragged him by his shoulders into the bathroom. They used a towel to wipe the blood off his face, which was bleeding badly. In the bathroom, the officers said to each other, "We got the wrong man. We going to have to put two charges on him because they going to blame us for this." After discussing what they were going to say about the incident, the officers dragged Cutino to the living room, where they handcuffed him. See id.

Cutino could not recall whether he kicked the officer while being held in a chokehold, but he denies kicking the officer before that time. He also denies trying to hit, bite, or growl at any officer. Cutino could not remember whether he placed his hands in his waistband during the encounter with police. Nor could he recall whether he braced his arms and resisted being handcuffed. See id.[1]

---

[1] More than a year after being deposed, Cutino filed an affidavit in opposition to Defendants' Motion. See DE 140. Among other points in the affidavit, Cutino denies that he braced his arms and resisted the Officers, either when he was on the bed or on the floor. See id. at 1-2, ¶ 2. Cutino further denies that, while on the floor, his hands were in his waistband and he refused to remove them. See id. at 2, ¶ 3. These statements are inconsistent with Cutino's deposition testimony—given over a year earlier—in which he could not remember whether he engaged in this conduct. To the extent that Cutino's affidavit conflicts with his deposition testimony, the Court will disregard the affidavit. See Van T. Junkins & Assocs. v. U.S. Indus., 736 F.2d 656, 657 (11th Cir. 1984) ("When a party has given clear answers to unambiguous questions which negate the existence of any genuine issue of material fact, that party cannot thereafter create such an issue with an affidavit that merely contradicts, without explanation, previously given clear testimony.").

The remaining material facts are largely undisputed.[2]  After being handcuffed, Cutino was treated by emergency personnel outside the residence, and police transported him to a local hospital.  Cutino was later charged with resisting an officer with violence.  See Fla. Stat. § 843.01; DE 123-1 at 9-10 (Booking Report).  Following a jury trial in August 2009, Cutino was acquitted of this charge.  See DE 123 at 8, ¶¶ 52, 54; id. at 10, ¶¶ 68, 69; DE 139 at 7, ¶¶ 52, 54; id. at 10, ¶¶ 68, 69.

### B.     Procedural History

On June 12, 2012, Cutino brought this action against the Officers and the City of Miramar (the "City").  See DE 1 (Compl.).[3]  In his current Amended Complaint, Cutino asserts three federal claims against the Officers pursuant to 42 U.S.C. § 1983: excessive use of force (Count I), unconstitutional arrest (Count II), and malicious prosecution (Count III).  See DE 12 at 5-7.  Cutino also pleads state-law claims against the Officers for malicious prosecution (Count IV) and against the City for assault and battery (Count V) and false imprisonment (Count VI).  See id. at 7-9.  Defendants have filed an Answer to the Amended Complaint, denying liability and alleging affirmative defenses, including that the Officers are entitled to qualified immunity.  See DE 30.

In their present Motion, Defendants argue that summary judgment should be granted in their favor because the Officers used reasonable force to apprehend Cutino, had probable cause to arrest him for resisting an officer with violence, and are

---

[2] The parties contest whether Cutino was under the influence of cocaine during the encounter with police and when specifically he was placed under arrest.  These issues do not affect the Court's resolution of the Motion and therefore will not be discussed further.

[3] A third police officer, Stephen Jepkema, was originally named a Defendant but was later voluntarily dismissed.  More, though Cutino has named several other unknown officers as Defendants, he has never identified or served those officers.

5

protected by qualified immunity.  See DE 122.  Cutino has filed a Response opposing the Motion, and Defendants have submitted a Reply.  See DE 141; DE 152.  The parties have also filed various documentary evidence in support of their arguments.

## II.     Discussion

### A.     Summary Judgment Standards

Summary judgment may be granted if "the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law."  Fed. R. Civ. P. 56(a).  The moving party "always bears the initial responsibility of informing the district court of the basis for its motion, and identifying those portions of [the record] which it believes demonstrate the absence of a genuine issue of material fact."  Celotex Corp. v. Catrett, 477 U.S. 317, 323 (1986).  To satisfy this burden, the movant must demonstrate that "there is an absence of evidence to support the nonmoving party's case."  Id. at 325.

If the movant makes this initial showing, the burden of production shifts, and the nonmoving party "must do more than simply show that there is some metaphysical doubt as to the material facts."  Matsushita Elec. Indus. Co. v. Zenith Radio Corp., 475 U.S. 574, 586 (1986).  The nonmovant "may not rest upon the mere allegations or denials in its pleadings" but instead must present "specific facts showing that there is a genuine issue for trial."  Walker v. Darby, 911 F.2d 1573, 1576-77 (11th Cir. 1990).  "If a party fails to properly support an assertion of fact or fails to properly address another party's assertion of fact as required by Rule 56(c), the court may . . . grant summary judgment if the motion and supporting materials—including the facts considered undisputed—show that the movant is entitled to it."  Fed. R. Civ. P. 56(e)(3).

Essentially, so long as the nonmoving party has had an ample opportunity to conduct discovery, it must come forward with affirmative evidence to support its claim. See Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 257 (1986). "A mere 'scintilla' of evidence supporting the opposing party's position will not suffice; there must be enough of a showing that the jury could reasonably find for that party." Walker, 911 F.2d at 1577. If the evidence advanced by the nonmovant "is merely colorable, or is not significantly probative, summary judgment may be granted." Anderson, 477 U.S. at 249-50 (citations omitted).

A court's function at the summary-judgment stage is not to "weigh the evidence and determine the truth of the matter but to determine whether there is a genuine issue for trial." Id. at 249. In so doing, the court must view the facts in the light most favorable to the nonmovant and draw all reasonable inferences in that party's favor. See Davis v. Williams, 451 F.3d 759, 763 (11th Cir. 2006). The court also must discern which issues are material: "Only disputes over facts that might affect the outcome of the suit under the governing law will properly preclude the entry of summary judgment. Factual disputes that are irrelevant or unnecessary will not be counted." Anderson, 477 U.S. at 248.

### B.   Qualified Immunity Standards

Qualified immunity "offers complete protection for government officials sued in their individual capacities if their conduct does not violate clearly established statutory or constitutional rights of which a reasonable person would have known." Wood v. Kesler, 323 F.3d 872, 877 (11th Cir. 2003) (internal quotations omitted). Such immunity is intended "to allow government officials to carry out their discretionary duties without the fear of personal liability or harassing litigation, protecting from suit all but the plainly

7

incompetent or one who is knowingly violating the federal law." Id. (internal quotations omitted). In this respect, qualified immunity "'gives government officials breathing room to make reasonable but mistaken judgments.'" Carroll v. Carman, 135 S. Ct. 348, 350 (2014) (per curiam) (quoting Ashcroft v. al-Kidd, 131 S. Ct. 2074, 2085 (2011)).

"To receive qualified immunity, the public official must first prove that he was acting within the scope of his discretionary authority when the allegedly wrongful acts occurred." Wood, 323 F.3d at 877 (internal quotation marks omitted). If the official makes this showing, the burden shifts to the plaintiff to overcome the privilege of qualified immunity. See Case v. Eslinger, 555 F.3d 1317, 1325 (11th Cir. 2009). To meet this burden, the plaintiff must prove (1) that the defendant violated a statutory or constitutional right and (2) that this right was "clearly established at the time of the challenged conduct." Carroll, 135 S. Ct. at 350. "A right is clearly established only if its contours are sufficiently clear that 'a reasonable official would understand that what he is doing violates that right.'" Id. (quoting Anderson v. Creighton, 483 U.S. 635, 640 (1987)). Although "a case directly on point" is not required, "existing precedent must have placed the statutory or constitutional question beyond debate." al-Kidd, 131 S. Ct. at 2083.

As with other motions for summary judgment, a court analyzing qualified immunity at the summary-judgment stage "must take the facts in the light most favorable to the party asserting the injury." Robinson v. Arrugueta, 415 F.3d 1252, 1257 (11th Cir. 2005). This approach "eliminates all issues of fact," and "the court has the plaintiff's best case before it." Id.; see Tolan v. Cotton, 134 S. Ct. 1861, 1866 (2014) (per curiam) (explaining that for either element of qualified immunity, "courts may not resolve genuine disputes of fact in favor of the party seeking summary judgment").

### C.     Analysis of Defendants' Motion

"A government official proves that he acted within the purview of his discretionary authority by showing objective circumstances which would compel the conclusion that his actions were undertaken pursuant to the performance of his duties and within the scope of his authority." Hutton v. Strickland, 919 F.2d 1531, 1537 (11th Cir. 1990) (internal quotation marks omitted). "Investigating crimes, conducting searches, and making arrests are legitimate job-related functions within the discretionary authority of police officers." Mears v. McCulley, 881 F. Supp. 2d 1305, 1318-19 (N.D. Ala. 2012) (footnote citations omitted). Here, the Officers were performing such duties when they executed the search warrant and apprehended Cutino. The Officers have therefore shown they acted within the scope of their discretionary authority, and the burden shifts to Cutino to overcome the qualified-immunity defense. See Case, 555 F.3d at 1325. With this framework in mind, the Court will address each of Cutino's claims against the Officers and will then turn to his claims against the City.

### 1.     Claims Against the Officers

#### a.     Excessive Force

Cutino first claims that the Officers are liable under § 1983 for violating his Fourth Amendment right not to be subjected to excessive force. "The Fourth Amendment's freedom from unreasonable searches and seizures includes the right to be free from excessive force during a criminal apprehension."[4] Mercado v. City of

---

[4] When they first encountered Cutino, the Officers were arguably trying to detain him as an occupant of the residence to be searched, rather than arresting him for resisting the officers with violence. See Michigan v. Summers, 452 U.S. 692, 705 (1981). Nevertheless, "*all* claims that law enforcement officers have used excessive force . . . in the course of an arrest, investigatory stop, or other 'seizure' of a free citizen should be analyzed under the Fourth Amendment and its 'reasonableness' standard." Graham, 490 U.S. at 395.

9

Orlando, 407 F.3d 1152, 1156 (11th Cir. 2005) (citing Graham v. Connor, 490 U.S. 386, 394-95 (1989)).  "The 'reasonableness' of a particular use of force must be judged from the perspective of a reasonable officer on the scene, rather than with the 20/20 vision of hindsight." Graham, 490 U.S. at 396.  Applying this reasonableness standard "requires careful attention to the facts and circumstances of each particular case, including the severity of the crime at issue, whether the suspect poses an immediate threat to the safety of the officers or others, and whether he is actively resisting arrest or attempting to evade arrest by flight." Id.  A court must also bear in mind that "police officers are often forced to make split-second judgments—in circumstances that are tense, uncertain, and rapidly evolving—about the amount of force that is necessary in a particular situation." Id. at 397.

     Here, despite viewing the facts in the light most favorable to Cutino, the Court finds that the Officers are entitled to qualified immunity on the excessive-force claim. The Officers' execution of the search warrant presented a high-risk situation:  they had information that a known criminal (Coombes) was selling narcotics from the home, that a shooting homicide had previously occurred in the front yard, and that visitors had been seen carrying handguns in their waistbands.  Too, the Officers had reason to be very cautious when they encountered Cutino in the bedroom, even if his hands were at his side rather than in his waistband.  See Los Angeles Cnty. v. Rettele, 550 U.S. 609, 614 (2007) (per curiam) ("Blankets and bedding can conceal a weapon, and one of the suspects was known to own a firearm . . . .  The Constitution does not require an officer to ignore the possibility that an armed suspect may sleep with a weapon within reach."). In these circumstances, even if the Officers did not announce their presence, it was reasonable for them to pull Cutino out of bed to detain him.

10

Further, the Officers testified, and Cutino has not refuted, that he resisted their efforts to handcuff him by bracing, tensing, and locking his arms. The unrebutted evidence also shows that, once Cutino was off the bed, his hands were in his waistband and he refused to remove them. From this conduct, the Officers were justified in believing that Cutino may have had a weapon and perhaps was preparing to use it. Thus, while the officer placing Cutino in a chokehold against the wall and punching him may have been a harsh response, it was a reasonable one under the circumstances. More, Cutino acknowledges that he may have kicked the officer applying the chokehold. And even if the officer's use of force were deemed excessive, Cutino cites no authority showing that the violation of the Fourth Amendment would have been clear to a reasonable officer in that situation. See Gomez v. Lozano, 839 F. Supp. 2d 1309, 1320-21 (S.D. Fla. 2012) (Jordan, J.) ("[T]he Eleventh Circuit has offered police officers wide discretion in reacting with force when the police officer believes that a suspect resists arrest." (citing Hoyt v. Cooks, 672 F.3d 972, 977-78 (11th Cir. 2012); Brown v. City of Huntsville, 608 F.3d 724, 739 (11th Cir. 2010); Lewis v. City of W. Palm Beach, 561 F.3d 1288, 1292 (11th Cir. 2009))).

According to Cutino, the officer who had him in a chokehold dropped him onto the granite floor, causing his head to strike the surface. Officers then pulled Cutino's arms behind his back and put their knees on his shoulder, and one officer held his feet. While trying to put Cutino's arms behind his back, officers kicked and stomped him and hit him with their fists. Again, however, Cutino has not refuted the Officers' testimony that he continuously resisted being handcuffed and refused to take his hands out of his waistband. Thus, although the Officers used rough physical force in subduing Cutino, that force was reasonably necessary given his defiant conduct toward them. Nor has

11

Cutino met his burden of showing that reasonable officers in the same circumstances would have clearly known that their actions were unlawful. To the contrary, Eleventh Circuit precedent indicates that any right violated here was not clearly established.[5] See, e.g., Hoyt, 672 F.3d at 980 (concluding that repeated use of Taser against suspect who resisted officers' attempts to handcuff him, and who later died, did not violate clearly established right against excessive force); Lewis, 561 F.3d at 1292 (holding that officers' use of cord to "hogtie" suspect who had already been handcuffed and bound did not violate clearly established right because suspect "did not remain compliantly restrained" and "continued to struggle," even though suspect died following incident). Accordingly, the Court will grant Defendants' Motion with regard to Cutino's claim for excessive force.

### b.     Unconstitutional Arrest

Cutino further alleges that the Officers unconstitutionally arrested him because they lacked probable cause. "It is clearly established that an arrest made without probable cause violates the Fourth Amendment." Thornton v. City of Macon, 132 F.3d 1395, 1399 (11th Cir.1998). For probable cause to exist under federal or Florida law, "an arrest must be objectively reasonable based on the totality of the circumstances." Lee v. Ferraro, 284 F.3d 1188, 1195 (11th Cir. 2002). "This standard is met when the facts and circumstances within the officer's knowledge, of which he or she has

---

[5] The Officers' alleged statements in the bathroom that they "got the wrong man" and were "going to have to put two charges on [Cutino]" do not affect the Court's qualified-immunity analysis. Because the Officers' use of force was reasonable, any subjective intentions they may have had are irrelevant. See Graham, 490 U.S. at 397 ("[T]he 'reasonableness' inquiry in an excessive force case is an objective one: the question is whether the officers' actions are 'objectively reasonable' in light of the facts and circumstances confronting them, without regard to their underlying intent or motivation.").

12

reasonably trustworthy information, would cause a prudent person to believe, under the circumstances shown, that the suspect has committed, is committing, or is about to commit an offense." Rankin v. Evans, 133 F.3d 1425, 1435 (11th Cir. 1998) (internal quotation marks omitted).

To receive qualified immunity, though, an officer need only have "arguable" probable cause for the arrest. Grider v. City of Auburn, 618 F.3d 1240, 1257 (11th Cir. 2010). Arguable probable cause exists when "reasonable officers in the same circumstances and possessing the same knowledge as the Defendants could have believed that probable cause existed to arrest Plaintiff." Von Stein v. Brescher, 904 F.2d 572, 579 (11th Cir. 1990). Whether arguable probable cause is present "depends on the elements of the alleged crime and the operative fact pattern." Grider, 618 F.3d at 1257.

Under Florida law, the crime of resisting an officer with violence requires proof that a suspect "(1) knowingly (2) resisted, obstructed, or opposed a law enforcement officer (3) who was in the lawful execution of any legal duty (4) by offering or doing violence to his person." Yarusso v. State, 942 So. 2d 939, 942 (Fla. 2d DCA 2006) (citing State v. Henriquez, 485 So. 2d 414, 415 (Fla. 1986)); see Fla. Stat. § 843.01. A suspect may offer or do violence to an officer's person even without striking him. See, e.g., Wright v. State, 681 So. 2d 852, 853-54 (Fla. 5th DCA 1996) (suspect's struggling, kicking, and flailing limbs held sufficient to support § 843.01 conviction). Here, the record demonstrates that while the Officers were executing a lawful search warrant, Cutino knowingly resisted their efforts to arrest him by bracing his arms, refusing to take his hands out of his waistband, and possibly kicking one of the officers. These facts show conclusively that the Officers had both actual and arguable probable

13

cause to arrest Cutino for resisting an officer with violence.  His unconstitutional-arrest claim therefore fails, and Defendants' Motion will be granted on that claim as well.

### c.     Malicious Prosecution (Federal and State)

Cutino next contends, based on federal and state law, that the Officers maliciously prosecuted him for resisting an officer with violence.  The Eleventh Circuit "has identified malicious prosecution as a violation of the Fourth Amendment and a viable constitutional tort cognizable under § 1983."  Wood v. Kesler, 323 F.3d 872, 881 (11th Cir. 2003).  To prove a federal malicious-prosecution claim, a plaintiff must establish (1) the elements of the common-law tort of malicious prosecution and (2) a violation of his Fourth Amendment right to be free from unreasonable seizures. See Kingsland v. City of Miami, 382 F.3d 1220, 1234 (11th Cir. 2004).  Under Florida law, a malicious-prosecution plaintiff must show that (1) an original judicial proceeding was commenced or continued against him, (2) the defendants were the legal cause of that proceeding, (3) the termination of the original proceeding constituted a bona fide termination of the proceeding in the plaintiff's favor, (4) there was an absence of probable cause for the original proceeding, (5) malice existed on the part of the defendants, and (6) the plaintiff suffered damages as a result of the original proceeding. See id. (citing Durkin v. Davis, 814 So. 2d 1246, 1248 (Fla. 2d DCA 2002)).  Failure to establish any one of these elements is fatal to the claim.  See Alamo Rent-A-Car, Inc. v. Mancusi, 632 So. 2d 1352, 1355 (Fla. 1994).

In this case, at least one element of a malicious-prosecution claim is lacking—an absence of probable cause.  As discussed above in Part II.C.1.b, the Officers had probable cause to arrest Cutino for the charged crime.  The Officers are thus entitled to summary judgment on Cutino's federal and state malicious-prosecution claims.

14

### 2. Claims Against the City

#### a. Assault and Battery

Cutino also claims that the City, the Officers' employer, is liable under state law for assault and battery. Florida law defines assault as "an intentional, unlawful offer of corporal injury to another by force, or exertion of force directed toward another under such circumstances as to create a reasonable fear of imminent peril." Sullivan v. Atl. Fed. Sav. & Loan Ass'n, 454 So. 2d 52, 54 (Fla. 4th DCA 1984). Battery is "the intentional infliction of a harmful or offensive contact upon the person of another." Id.

Police officers who use force in making a lawful arrest receive a presumption of good faith and are liable for battery "only where the force used is clearly excessive." City of Miami v. Sanders, 672 So. 2d 46, 47 (Fla. 3d DCA 1996). "A battery claim for excessive force is analyzed by focusing upon whether the amount of force used was reasonable under the circumstances." Id. As explained in Part II.C.1.a above, the Officers' use of force here was reasonable in light of the situation they faced, and that force was not "clearly excessive." And to the extent Cutino alleges that the Officers assaulted him during the same encounter, that claim is likewise foreclosed since any threat of force was reasonable. Consequently, the Motion will be granted with regard to the assault-and-battery claim against the City.

#### b. False Imprisonment

Last, Cutino asserts that the City is liable because the Officers falsely imprisoned him. To prevail on a claim for false imprisonment or false arrest,[6] a plaintiff must show

---

[6] "False arrest and false imprisonment are different labels for the same cause of action." Weissman v. K-Mart Corp., 396 So. 2d 1164, 1165 n.1 (Fla. 3d DCA 1981) (citing Jackson v. Biscayne Med. Ctr., Inc., 347 So. 2d 721, 723 (Fla. 3d DCA 1977)).

15

that he was "unlawfully restrained without color of authority."  Everett v. Fla. Inst. of Tech., 503 So. 2d 1382, 1383 (Fla. 5th DCA 1987).  The existence of probable cause is a defense to false imprisonment.  See Daniel v. Vill. of Royal Palm Beach, 889 So. 2d 988, 990 (Fla. 4th DCA 2004) (citing Jackson v. Navarro, 665 So. 2d 340, 342 (Fla. 4th DCA 1995)).  Again, the Officers here possessed probable cause to arrest Cutino.  So the City is entitled to summary judgment on his false-imprisonment claim too.

### III.     Conclusion

For the reasons discussed, it is hereby

**ORDERED AND ADJUDGED** that Defendants' Motion for Summary Judgment [DE 122] is **GRANTED**.  The Court will enter a separate Final Judgment consistent with this Order.

**DONE AND ORDERED** in Chambers at Fort Lauderdale, Broward County, Florida, this 14th day of January, 2015.

_/s/ James I. Cohn_
JAMES I. COHN
United States District Judge

Copies provided to:

Counsel of record via CM/ECF